AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br><br>JOHN RIAZZI<br>*Defendant(s)* | )<br>)<br>)  Case No.  3:18 mj 821<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __July 23-24, 2016__ in the county of __Montgomery__ in the __Southern__ District of __Ohio__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 42, U.S.C. Section 7413(c)(1) | The knowing failure to thoroughly inspect a facility prior to renovation. |
| Title 42, U.S.C. Section 7413(c)(1) | The knowing failure to provide written notice to the EPA and its designee at least 10 working days prior to commencing a renovation activity. |
| Title 42, U.S.C. Section 7413(c)(1) | The knowing failure to adequately wet regulated asbestos-containing material while a jurisdicitional amount was being removed during a renovation activity. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

THOMAS J. KOHL, JR., SPECIAL AGENT, U.S. EPA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/27/18

_____
*Judge's signature*

City and state: DAYTON, OHIO

MICHAEL J. NEWMAN, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT

I, Thomas J. Kohl, Jr., duly sworn, depose and say:

### Introduction

1. I am a Special Agent with the United States Environmental Protection Agency, Office of Criminal Enforcement, Forensics, and Training—Criminal Investigation Division ("U.S. EPA-CID"). I have been so designated, as a Special Agent, for approximately 17 years. I am presently assigned to the Cleveland, Ohio, Resident Office, located in Middleburg Heights, Ohio. My immediate responsibilities include investigations of environmental criminal violations that occur in the State of Ohio.

2. I was trained in criminal investigations at the Federal Law Enforcement Training Center in Glynco, Georgia. Through training and experience, I have become familiar with regulations governing the proper notification, handling, removal, and disposal requirements associated with asbestos containing building materials. As a Special Agent, I have conducted numerous criminal investigations of Clean Air Act violations, including those related to asbestos-containing building materials.

3. Along with other agents, officers, and investigators of the Ohio Bureau of Criminal Identification and Investigation, the Ohio Environmental Protection Agency, and EPA, I am currently involved in an investigation of Clean Air Act offenses and other offenses committed by JOHN RIAZZI (hereinafter referred to as "RIAZZI"). In particular, we have investigated RIAZZI's role in renovating a decades-old facility built using asbestos containing materials. Based on the investigation conducted to date, there is probable cause to believe that RIAZZI knowingly failed to thoroughly inspect the facility prior to renovation, knowingly failed to provide written notice to the U.S. EPA and its designee at least 10 working days prior to commencing a

renovation activity, and knowingly failed and caused others to fail to adequately wet regulated asbestos-containing material ("RACM") while it was being removed during a renovation activity that would and did strip more than the jurisdictional amount of RACM (160 square feet), all in violation of 42 U.S.C. § 7413(c)(1). I submit this affidavit in support of a criminal complaint.

4. I make this affidavit from knowledge based on my participation in this investigation, including witness interviews by myself and/or other law enforcement officers, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. For purposes of this affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

5. The information set forth in this affidavit is for the limited purpose of establishing probable cause that RIAZZI committed the offenses alleged in the complaint. This affidavit, therefore, does not necessarily include all of the information collected during this investigation.

## STATUTORY & REGULATORY BACKGROUND

6. Congress enacted 42 U.S.C. §§ 7401 *et seq*. (the Clean Air Act) "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare...." To that end, Congress designated asbestos as a hazardous air pollutant. 42 U.S.C. § 7412(b)(1).

7. Congress found that medical science has established no minimum level of exposure to asbestos fibers that is considered safe to individuals exposed to the fibers. 20 U.S.C. § 3601(a)(3). Thus, Congress authorized the U.S. EPA under the Clean Air Act to establish the National Emissions Standards for Hazardous Air Pollutants (NESHAP), commonly known as the "work practice standards," that must be followed to minimize the potential release of asbestos fibers during renovation or demolition work, which were written to ensure the safe and proper handling,

removal, and disposal of asbestos. 42 U.S.C. § 7412(h)(1); 40 C.F.R. §§ 61.145, 61.150, 61.154. During the timeframe relevant to the complaint, these work practice standards applied to an owner or operator of a renovation at a facility where the combined amount of RACM on facility components to be stripped, removed, dislodged, cut, drilled, or similarly disturbed was at least 160 square feet, 260 linear feet, or 35 cubic feet. 40 C.F.R. § 61.145(a).

## DEFINITIONS

8. For the work practice standards and the complaint presented with this affidavit, the following definitions, from 40 C.F.R. § 61.141, apply:

9. An "owner or operator of a demolition or renovation" meant any person who owned, leased, operated, controlled, or supervised the renovation or demolition, or both.

10. "Facility" meant any institutional, commercial, public, or industrial structure, installation, or building, or any residential structure containing more than four dwelling units.

11. "Friable" asbestos material meant any material containing more than one percent asbestos that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure.

12. Category I nonfriable asbestos-containing material (ACM) meant asbestos-containing packings, gaskets, resilient floor coverings, and asphalt roofing products containing more than one percent asbestos.

13. RACM included friable asbestos material as well as Category I nonfriable asbestos-containing material that has become friable.

14. "Renovation" meant altering a facility or one or more facility components in any way, including the stripping or removal of RACM from a facility component.

## REQUIREMENTS

15. The asbestos work practice standards required an owner or operator to follow specific rules and regulations for the safe handling, stripping, removal, and disposal of RACM during renovation

to prevent or minimize the emission of asbestos into the air. These work practice standards required the owner or operator to take the following steps with respect to RACM and potential RACM, among others.

16. Prior to commencement of the renovation or demolition, owners and operators had to thoroughly inspect the facility or part of the facility where renovation or demolition will occur for the presence of asbestos, including Category I nonfriable asbestos-containing material (40 C.F.R. § 61.145(a));

17. Owners and operators had to provide written notice to the EPA Administrator or designee of intent to renovate a facility or facility components containing RACM at least 10 working days before asbestos removal or stripping work began (40 C.F.R. § 61.145(b));

18. Owners and operators had to remove all RACM from a facility being renovated or demolished before any activity began that would break up, dislodge, or similarly disturb the material (40 C.F.R. § 61.145(c)(1));

19. Owners and operators had to have present during any stripping, removing, handling, or disturbing of RACM at least one on-site representative, such as a foreman or management-level person or other authorized representative, who was trained in the provisions of the asbestos work practice standards and the means of complying with them (40 C.F.R. § 61.145(b)(xiii) and (c)(8));

20. Owners and operators had to ensure that they or their employees adequately wetted the RACM during stripping operations (40 C.F.R. § 61.145(c)(3));

21. Owners and operators had to ensure that they or their employees carefully lowered the removed or stripped RACM to the ground, without dropping, throwing, sliding, or otherwise damaging or disturbing the material (40 C.F.R. § 61.145(c)(6));

4

22. Owners and operators, as generator of waste, had to ensure that all RACM was disposed of at a site authorized to accept asbestos-containing waste (40 C.F.R. § 150(b)).

## STATE PROGRAMS

23. Congress authorized each state to develop a program for the implementation and enforcement of the NESHAP and other requirements of the Clean Air Act, 42 U.S.C. § 7412, and submit the program to EPA for approval. A program submitted by a state could provide for partial or complete delegation of EPA's authority to implement and enforce the NESHAP and prevention requirements, but could not include authority to set standards less stringent than those promulgated by EPA. 42 U.S.C. § 7412(l).

24. In 1982, the EPA Administrator delegated authority to the State of Ohio to administer and enforce the asbestos NESHAP asbestos. 40 C.F.R. § 61.04(b). The State of Ohio further delegated that authority to the Regional Air Pollution Control Agency for Clark, Darke, Greene, Miami, Montgomery, and Preble Counties (RAPCA) by agreement and under Ohio Revised Code § 3745. The delegation does not prohibit EPA from enforcing any applicable federal emission standard or requirement. 42 U.S.C. § 7412(l)(7).

## FACTS SUPPORTING PROBABLE CAUSE

25. Located at 617 East 3rd Street in Dayton is the former Dayton Power and Light Third Street Station (the "Steam Plant"). Constructed in approximately 1917 by Dayton Power and Light, the Steam Plant was used to generate steam for use in Dayton area businesses.

26. Dayton Power and Light closed the Steam Plant many years ago and it has remained unused. In 2015, the City of Dayton purchased the Steam Plant after it went through the foreclosure process.

5

27. On or about September 24, 2015, St. Peters Partners LLC ("SPP") purchased the Steam Plant from the City of Dayton for $10. As part of the purchase contract, SPP agreed to renovate the Steam Plant, turning it into office space. The City of Dayton awarded SPP a $90,000 grant for construction costs and did then pay SPP that amount. SPP is owned and operated by RIAZZI.

28. RIAZZI, on behalf of SPP, contracted with the Miller-Valentine Group ("MV") to renovate the Steam Plant and to build a new structure on the property.

29. In late March of 2016, in preparation for the removal and replacement of the existing roofing material on the roof of the main building of the Steam Plant, the Health and Safety Director for MV ("MV Health Director"), and a certified asbestos specialist, collected samples of roofing material he found attached to a roof vent on the ground in front of the Steam Plant. According to MV Health Director, the roofing material that he sampled appeared to be a weathered asphaltic material. MV Health Director did not have access to the main roof at the time. The main roof is approximately 7000 square feet in surface area.

30. MV Health Director submitted four samples of the roofing material for analysis. The analysis showed that three of the four samples of the material contained between 20 and 30 percent asbestos and that the fourth sample contained less than one percent asbestos.

31. MV emailed the analysis of the asbestos samples to RIAZZI on March 18, 2016.

32. In May 2016, MV Health Director gained access to the roof of the Steam Plant, where he conducted a "friability test" to determine whether the roofing material was friable. MV Health Director found that the roofing material could be crumbled by hand pressure, and concluded it was therefore friable. MV emailed this information to RIAZZI on May 21, 2016.

33. The deteriorated condition of the roof is visible in several photographs taken in September 2015, January 2016, and May 2016, which show that the top tar layer was mostly weathered away,

that there was heavy damage to the underlying silver-colored material, and that small trees and plants were growing out of the roof.

34. Sometime after the MV analysis was completed and before late-July 2016, MV received the first estimate, from a certified asbestos contractor, to remove the Steam Plant's RACM. The estimate for abating the roofing material was approximately $20,000. This estimate of cost was provided to RIAZZI. RIAZZI stated to MV that he believed the estimate was too high. RIAZZI asked MV to obtain other bids to abate the roofing material from the roof of the Steam Plant.

35. MV arranged for another certified asbestos abatement company to visit the Steam Plant. The purpose of visit was to get an additional estimate to abate the roofing material from the roof of the Steam Plant. This visit was originally scheduled for July 22, 2016, but was rescheduled for July 25, 2016. Upon information and belief, RIAZZI was aware of the purpose and timing of this site visit.

36. On or about Thursday, July 21, 2016, RIAZZI offered two individuals ("Individuals A and B") $5,500 to remove the roofing material during the weekend prior to the July 25, 2016, site visit. Individuals A and B were scrap metal collectors and haulers who had been previously hired by RIAZZI to do odd jobs at the Steam Plant, including sanding lead paint off of beams inside the Steam Plant. Individuals A and B had no previous roofing or asbestos abatement experience.

37. According to Individuals A and B, RIAZZI directed them to tear off the roof and to remove the vents and flashing around the vents. RIAZZI never told them that the roof contained asbestos, nor did he give them any specific limitations on what should not be removed or precautions to take. According to Individual B, they told RIAZZI that their plan was "to get up there with a tear-off shovel and go to town tearing it off."[1] Over the weekend, Individuals A and B proceeded to

---

[1] Individual B, like many of the witnesses in this case, was deposed as part of a civil case between SPP and MV in which SPP sued MV for breach of contract after MV terminated the contract following the events in question.

7

remove the top layer of the roofing material, throwing it off the third-story roof onto the ground below. Smaller roof debris that accumulated was shoveled off the edge of the roof. The debris was collected on the ground, loaded into Individuals A and B's pickup truck and driven to the local garbage dump. Individuals A and B worked on Friday afternoon and all day Saturday and Sunday removing the roof in this manner.

38. RIAZZI visited the Steam Plant on Saturday, July 23, and Sunday, July 24, to check on Individuals A and B's progress. On Sunday, RIAZZI was at the Steam Plant as Individuals A and B were finishing. RIAZZI used a leaf blower to blow roofing debris from the curtilage of the Steam Plant into Third Street. He also took a wheelbarrow-load of roofing debris that would not fit into Individuals A and B's truck across the street and dumped it in the bushes under a billboard.

39. Because the garbage dump was not open on Sunday, Individuals A and B unloaded the roofing debris generated on Sunday into Individual B's garage.

40. On July 25, 2016, representatives from MV were at the Steam Plant with a certified asbestos abatement contractor, to obtain an estimate to abate the roofing material. When they went onto the roof, they observed that the top layers of roofing material had been removed. They also found remnants and debris from the roofing material on the ground outside the Steam Plant, on the ledges of the Steam Plant, on the sidewalk near the Steam Plant, and on the surface of Third Street.

41. On July 26, 2016, representatives from MV participated in a conference call with RIAZZI about the removal of the roofing material from the Steam Plant. During the conference call, RIAZZI stated that he hired two employees from Bauer Roofing "off-hours" to remove the roofing material. RIAZZI explained that he hired these individuals because he was unhappy with the proposed cost of $20,000 to conduct a proper abatement of the material from the roof. He stated that hiring these individuals on an "off-hour" basis was substantially less expensive than the

8

proposed $20,000 cost. RIAZZI went on to say that the individuals that conducted the removal "said it was not friable," said that "they did not have a concern with it," and said that "from their experience and what they've been involved in, it was not a concern there in terms of hazardous material." RIAZZI also claimed he did not know where the roofing material was taken after it was removed and expressed disbelief that there was anything in the roadway.

42. On or about July 26, 2016, MV alerted RAPCA to the removal.[2] In a series of phone calls and statements at in-person meetings, including an in-person meeting on August 4, 2016, RIAZZI told two RAPCA Investigators that he had hired two employees of Bauer Roofing to remove the roof off-hours and that he did not have the names or contact information for the two individuals. RIAZZI also told RAPCA that the employees were "trained to evaluate [the] material."

43. RIAZZI subsequently hired an environmental consultant to test the pile of roofing debris at Individuals B's garage. On September 16, 2016, this consultant took three samples from the garage, all of which came back positive for high levels of asbestos. RIAZZI did not advise RAPCA of the location of the roofing material, of the testing, or the results of same until after RAPCA learned of the location of the roofing debris.

44. In November 2016, RAPCA became aware of the presence of roofing debris at Individuals B's garage. A RAPCA investigator visited the garage, took ten representative samples, and conducted a friability test. The investigator determined that the roofing materials were friable. Her

---

[2]Following the weekend removal of the roofing material, MV Health Director inexplicably generated a report dated April 4, 2016, that combined his March visit—in which he tested roofing material attached to a roof vent—and his May visit—in which he conducted a "friability test" on the roof—and made it appear as though he had conducted a single comprehensive inspection. He reiterated this false timeline in a subsequent meeting with representatives of RAPCA. Upon information and belief, others at MV were unaware of this conduct until it came to light as part of the civil litigation. As a result of MV Health Director's behavior, the judge in the civil suit issued at least two rulings in which he found MV Health Director to have acted untruthfully in generating this April 4 report and criticized MV for relying on it. The civil suit was eventually settled.

9

samples were sent to the EPA National Enforcement Investigations Center, where all ten samples were found to be friable and to contain more than 1% asbestos.

45. In a letter dated September 1, 2016, an attorney representing SPP sent RAPCA a letter asserting the following facts, among others: "On the weekend of July 23-24, Owner hired 2 roofing contractors to begin removing the selected portions of roofing materials....Owner specifically instructed his roofing subcontractors to manually pull up the flat roofing materials but leave the roof vents and all flashing around the roof vents and along the perimeter parapet walls undisturbed."

## CONCLUSION

46. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that on or around July 22 through July 24, 2016, **JOHN RIAZZI**, in the Southern District of Ohio, knowingly failed to thoroughly inspect a facility prior to renovation, in violation of 42 U.S.C. § 7413(c)(1).

47. I further submit that there is probable cause to believe that on or around July 22 through July 24, 2016, **JOHN RIAZZI**, in the Southern District of Ohio, knowingly failed to provide written notice to the U.S. EPA and its designee at least 10 working days prior to commencing a renovation activity, in violation of 42 U.S.C. § 7413(c)(1).

48. I further submit that there is probable cause to believe that on or around July 22 through July 24, 2016, **JOHN RIAZZI**, in the Southern District of Ohio, knowingly failed and caused others to fail to adequately wet RACM while it was being removed during a renovation activity that would and did strip over the jurisdictional amount of RACM (160 square feet), in violation of 42 U.S.C. § 7413(c)(1).

49. I therefore respectfully request that a criminal complaint be granted upon this affidavit.

Special Agent Thomas J. Kohl, Jr.
U.S. Environmental Protection Agency
Criminal Investigation Division

Sworn to and subscribed before me this 27th day of December, 2018.

MICHAEL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

11